******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

JAMES P. CLARK *v.* COMMISSIONER OF
MOTOR VEHICLES
(AC 40061)

DiPentima, C. J., and Elgo and Eveleigh, Js.

*Syllabus*

The plaintiff appealed to the trial court from the decision of the defendant,
the Commissioner of Motor Vehicles, to suspend the plaintiff's motor
vehicle operator's and commercial driver's licenses for operating a motor
vehicle while under the influence of intoxicating liquor. The suspension
stemmed from an incident in which the plaintiff lost control of his
vehicle while driving through an intersection, crashed into a snowbank,
and continued approximately sixty-five feet into a field. Prior to the
accident, the plaintiff had consumed a number of alcoholic beverages
at a restaurant located near the accident scene. Sometime after 8:30
p.m., the plaintiff left the restaurant, and, as he was driving home, his
wife called to ask him to pick up their daughter at a dance studio that
was ten to fifteen minutes from their house. The plaintiff then turned
his vehicle around and headed toward the studio but crashed sometime
thereafter. Following the accident, a fire chief from a neighboring town
observed the plaintiff's vehicle off the road and stopped to ask the
plaintiff if he was all right. He replied that he was, and the fire chief
notified the state police at approximately 9:38 p.m. and left the scene.
When the police arrived soon thereafter, they found the vehicle unoccu-
pied. At approximately 10 p.m., a state police officer arrived at the
plaintiff's residence and began speaking with the plaintiff's wife. Shortly
thereafter, the plaintiff and the daughter returned home in a vehicle
driven by a third party. After the plaintiff failed three field sobriety tests,
he was arrested and brought to the state police barracks, where he
submitted to blood alcohol content tests. The tests commenced at 11:05
p.m., and the results indicated that he had an elevated blood alcohol
content. Following an administrative hearing, the commissioner sus-
pended the plaintiff's licenses, finding, inter alia, that the plaintiff was
operating his vehicle after 9:05 p.m. and that the blood alcohol content
testing commenced at 11:05, which was within two hours of his operation
of the vehicle, as required by the statute (§ 14-227a [b]) governing,
inter alia, the admissibility of chemical analysis results. The trial court
dismissed the plaintiff's appeal, and the plaintiff appealed to this
court. *Held*:

1. The trial court correctly determined that there was substantial evidence
   in the record to support a finding that there was probable cause that
   the plaintiff operated his motor vehicle while under the influence within
   the two hours preceding the commencement of his blood alcohol content
   testing, as the inferences underlying the commissioner's conclusion that
   the plaintiff was operating his vehicle sometime after 9:05 p.m. were
   supported by compelling circumstantial evidence in the record: although
   the plaintiff claimed that he crashed his vehicle before 9:05 p.m. and
   sat in it for a while until the fire chief arrived at the scene, the evidence
   indicated that the plaintiff did not wait in his vehicle long after the
   accident, as the intersection where the accident occurred was a heavily
   traveled, well marked, four-way intersection that was located close
   to the restaurant at which the plaintiff had been drinking, and the
   commissioner reasonably could infer that the fire chief reported the
   accident shortly after it occurred because the vehicle was in a place
   where it would have been observable to an average passerby and the
   longer the vehicle remained off the road, the less likely it would go
   unnoticed and unreported; moreover, the commissioner reasonably
   could have concluded that the plaintiff's operation of the vehicle
   occurred closer to 9:38 p.m. than 9:05 p.m., as the evidence indicated
   that the plaintiff was in a hurry to pick up his daughter at the dance
   studio and to bring her home, the plaintiff having requested a ride to
   the dance studio from a third party, having abandoned his vehicle a
   short distance from the restaurant, and having failed to return to the
   scene of the accident to wait for assistance after he already secured a

ride for his daughter, even though they drove past it on their way back home.

2. The trial court did not abuse its discretion in denying the plaintiff's motion to reargue or for reconsideration, which was based on his claim that he received ineffective assistance from his counsel at the administrative hearing resulting in a failure to present additional relevant evidence, as the absence of such evidence formed the basis for his motion and the plaintiff failed to make a timely application for remand for the taking of additional evidence pursuant to the applicable statute (§ 4-183 [h]).

Argued February 14—officially released July 17, 2018

*Procedural History*

Appeal from the decision of the defendant suspending the plaintiff's motor vehicle operator's and commercial driver's licenses, brought to the Superior Court in the judicial district of New Britain and tried to the court, *Huddleston, J.*; judgment dismissing the appeal; thereafter, the court denied the plaintiff's motion to reargue or for reconsideration, and the plaintiff appealed to this court. *Affirmed.*

*Jack G. Steigelfest*, with whom was *Christopher M. Harrington*, for the appellant (plaintiff).

*Drew S. Graham*, assistant attorney general, with whom, on the brief, was *George Jepsen*, attorney general, for the appellee (defendant).

*Opinion*

DiPENTIMA, C. J. When a driver is suspected of operating a motor vehicle while under the influence of alcohol, our statutes require that law enforcement commence any consensual chemical alcohol tests within two hours of such operation. Otherwise, the results of those tests, although ostensibly valid, are neither admissible nor competent evidence of operation under the influence. In an administrative appeal from the suspension of both his standard and commercial operator's licenses, the plaintiff, James P. Clark, challenged, among other things, the finding of the defendant, the Commissioner of Motor Vehicles (commissioner),[1] that his failed chemical alcohol tests were timely. The Superior Court was not persuaded and dismissed his appeal. The plaintiff now appeals, claiming that the court improperly (1) determined that there was substantial evidence in the record to support a finding that there was probable cause to arrest him for operating a motor vehicle while under the influence of alcohol, and (2) denied his motion to reargue or for reconsideration. We disagree and, accordingly, affirm the judgment of the Superior Court.

The court summarized the facts before the commissioner and procedural history as follows: "On the evening of February 10, 2016, the fire chief of the Hebron Fire Department observed a Volkswagen Passat off the roadway at the intersection of New London Road (Route 85) and Lake Hayward Road in Colchester. He saw a man, later determined to be the plaintiff, in the driver's seat. The fire chief approached the vehicle and asked whether the plaintiff was all right. The plaintiff replied that he had [the American Automobile Association (AAA)] en route, and he was okay. The fire chief then returned to his own vehicle and notified the state police of the accident at approximately [9:38 p.m.]

"At [9:41 p.m.], two state police officers were dispatched to the accident scene. Upon arrival, the officers found an unoccupied Volkswagen and deduced from tracks in deep snow that it had been traveling north on Route 85 when its operator disregarded a stop sign at the intersection, crossed over the intersection and crashed into a snowbank at the northeast corner of the intersection, continuing approximately 65.2 feet from the road to its point of final rest. An advertising sign for 'NuNu's Bistro' was subsequently found in the snow beneath the Volkswagen, indicating that the vehicle had struck and snapped off the sign as it traveled into the snowbank. The arresting officer, Bryan Kowalsky, noted that the intersection was a well marked major intersection in Colchester, with four-way stop signs and a flashing red light above the intersection. The intersection was in a very heavily traveled area. The road was dry and no adverse weather conditions were present.

"Kowalsky ran the vehicle's license plate number to obtain information about its owner. He then went to the address of the plaintiff, who was the owner of the vehicle, to find out who had been operating the vehicle and whether there were any injuries. He arrived there at approximately [10 p.m.] The plaintiff was not home. His wife answered the door and spoke briefly with Kowalsky. She told him that her husband 'is driving the Volkswagen' and that 'he was on his way to pick up their [fifteen] year old daughter from Doreen's dance studio in Colchester.' . . . Kowalsky testified that the dance studio is located ten to fifteen minutes from the plaintiff's home. Kowalsky informed the plaintiff's wife that the Volkswagen had been in an accident and the operator was not with the Volkswagen.

"A moment[2] after Kowalsky began to speak with the plaintiff's wife, he saw a black pickup truck pull into the driveway. The plaintiff's teenaged daughter got out and came into the house. The plaintiff's wife asked her what had happened. She said that she wasn't in the car and that '[the plaintiff] came and picked [her] up from dance [class] in the truck.' . . .

"Kowalsky then saw the plaintiff get out of the passenger's seat of the truck. The plaintiff entered the house through a back door. Kowalsky asked if he had been involved in an accident that evening. The plaintiff replied that he had spun off the road and hit a snowbank. He said he called AAA and then left, 'figuring they would come get the car.' . . . Kowalsky asked why he had not stopped to talk with police at the scene when he rode past on his way home the second time, but the plaintiff had no response. When asked if he had had anything to drink that evening, the plaintiff answered that he had had a few drinks. The plaintiff's speech was slurred, his eyes were glazed, and an odor of alcohol emanated from his person.

"Kowalsky asked the plaintiff to complete certain tasks, including a finger counting test, reciting the alphabet from C to T without singing, and counting down from [thirty-seven] to [thirteen]. The plaintiff was unable to complete these tasks and expressed disbelief that he could not do them.

"Kowalsky then asked him to step outside to complete three standard field sobriety tests. The plaintiff failed all three tests. Kowalsky placed him under arrest for driving under the influence and took him to Troop K for processing. After speaking with an attorney by telephone, the plaintiff agreed to take a breath test. While Kowalsky was processing him, the plaintiff told Kowalsky that he had been drinking at Toyo, a restaurant north of the intersection where he drove off the road, from about [2:30 p.m.] that afternoon. He said he last ate at [2:30 p.m.], and then had about five beers and a couple of glasses of wine. He said he finished

drinking at [8:30 p.m.] He said he had been at the restaurant catching up with an old friend and was on his way home when his wife called him and asked him to pick up their daughter from dance class. He said that he should have just continued on his way home rather than turning around to go get his daughter.

"Kowalsky commenced the breath test at [11:05 p.m.], obtaining a reading of .1564. He repeated the test at [11:25 p.m.], obtaining a reading of .1570. The plaintiff was then charged with violations of General Statutes § 14-301 (failure to obey a stop sign); [General Statutes] § 14-224b (evading responsibility); [General Statutes] § 14-12 (operating an unregistered vehicle); and [General Statutes] § 14-227a (operating under the influence). . . .

"On March 4, 2016, the Department of Motor Vehicles (department) held an administrative hearing to determine whether the plaintiff's operator's and commercial driver's licenses should be suspended for failing a chemical test. The attorney presenting the evidence on behalf of the department called Kowalsky as a witness. He testified as to the matters in the A-44 form[3] and attached reports, which were admitted into evidence. The plaintiff was present at the hearing with counsel but did not cross-examine Kowalsky, testify himself, or offer other evidence.

"After Kowalsky testified, the plaintiff's counsel argued that there was no evidence of probable cause for the arrest and no evidence of the time of the accident and, therefore, no way to establish that the plaintiff had operated a vehicle within two hours of the commencement of the chemical test. He also asserted that a friend of the plaintiff, not the plaintiff, had been driving the truck in which the plaintiff and his daughter arrived at their home.

"After the plaintiff's counsel made these arguments, the attorney representing the department asked Kowalsky whether the plaintiff had admitted that he was operating the motor vehicle. Kowalsky testified that the plaintiff admitted that he was operating the motor vehicle and that he had been drinking at Toyo.

"On March 7, 2016, the [commissioner] issued a ruling in which he made the four affirmative findings required by General Statutes § 14-227b (g)[4] and further found that the plaintiff is over the age of twenty-one and is the holder of a commercial driver's license. He also made the following subordinate finding: 'Based upon sworn, credible testimony of Officer Kowalsk[y] it is found that there was operation by [the plaintiff] at a point in time after [9:05 p.m.] such that the testing commencing at [11:05 p.m.] was within [two] hours as required by . . . § 14-227a (b).'[5] The [commissioner] suspended the plaintiff's operator's license for forty-five days, required the use of an ignition interlock device

for six months, and suspended his commercial driver's license for one year.

"On March 22, 2016, the plaintiff filed a request for reconsideration of the subordinate finding, which he misquoted as stating that '[t]he BAC tests were administered within two (2) hours of the [first] trooper's arrival.' He then argued that the finding was improper because the legal standard required testing within two hours of operation, not within two hours of the officer's arrival.

"On April 5, 2016, the department denied the request for reconsideration with an order stating that '[t]here is sufficient evidence in the file to support the [commissioner's] decision.'" (Citations omitted; footnotes added.)

The plaintiff then appealed to the Superior Court pursuant to the provisions of the Uniform Administrative Procedure Act, General Statutes § 4-166 et seq. (UAPA). After a hearing, the court dismissed the plaintiff's appeal and subsequently denied his motion to reargue or for reconsideration. The plaintiff thereafter appealed to this court.

Turning now to the plaintiff's arguments on appeal, we preface our review with the applicable legal principles. "[J]udicial review of the commissioner's action is governed by the [UAPA], and the scope of that review is very restricted. . . . [R]eview of an administrative agency decision requires a court to determine whether there is substantial evidence in the administrative record to support the agency's findings of basic fact and whether the conclusions drawn from those facts are reasonable. . . . Neither this court nor the [Superior Court] may retry the case or substitute its own judgment for that of the administrative agency on the weight of the evidence or questions of fact. . . . Our ultimate duty is to determine, in view of all of the evidence, whether the agency, in issuing its order, acted unreasonably, arbitrarily, illegally or in abuse of its discretion. . . .

"The substantial evidence rule governs judicial review of administrative fact-finding under the UAPA. [See] General Statutes § 4-183 (j) (5) and (6). An administrative finding is supported by substantial evidence if the record affords a substantial basis of fact from which the fact in issue can be reasonably inferred. . . . The substantial evidence rule imposes an important limitation on the power of the courts to overturn a decision of an administrative agency . . . .

"It is fundamental that a plaintiff has the burden of proving that the commissioner, on the facts before him, acted contrary to law and in abuse of his discretion [in determining the issue of probable cause]. . . . The law is also well established that if the decision of the commissioner is reasonably supported by the evidence it must be sustained. . . .

"We have stated that [p]robable cause, broadly defined, comprises such facts as would reasonably persuade an impartial and reasonable mind not merely to suspect or conjecture, but to believe that criminal activity has occurred. . . . Reasonable minds may disagree as to whether a particular [set of facts] establishes probable cause. . . . Thus, the commissioner need only have a substantial basis of fact from which [it] can be inferred . . . that the evidence in the administrative record supported a finding of probable cause with respect to the plaintiff's violation of § 14-227a." (Citations omitted; internal quotation marks omitted.) *Murphy* v. *Commissioner of Motor Vehicles*, 254 Conn. 333, 343–44, 757 A.2d 561 (2000); see also *Finley* v. *Commissioner of Motor Vehicles*, 113 Conn. App. 417, 422–23, 966 A.2d 773 (2009).

I

The plaintiff first claims the record does not support the Superior Court's determination that there was substantial evidence to support a finding that there was probable cause that he operated his motor vehicle within the two hours preceding his failed chemical alcohol tests. We do not agree.

The following additional facts are relevant to the plaintiff's claim. The plaintiff consumed no fewer than seven alcoholic beverages between 2:30 and 8:30 p.m. at Toyo, an establishment "less than thirty seconds away" from the scene of the accident. Sometime after 8:30 p.m., the plaintiff left Toyo for his home. On the way, his wife called to ask him to pick up their daughter at a dance studio ten to fifteen minutes away from their home. Upon receiving this call, the plaintiff turned around his car and headed northbound on Route 85 toward the dance studio. According to Kowalsky's report, the tracks in the snow suggest that when the plaintiff's vehicle reached the intersection of Route 85 and Lake Hayward Road, it ran through a stop sign and flashing red light before crashing through a snowbank and continuing 65.2 feet into a field. There is no evidence to suggest that the plaintiff operated a motor vehicle thereafter.

The question of whether the plaintiff operated his motor vehicle while intoxicated[6] within the two hour statutory window, i.e., at or after 9:05 p.m., is one of fact. As recited earlier in this opinion, our review of administrative fact-finding is circumscribed by the UAPA; the commissioner need only have a "substantial basis of fact" from which the time of operation reasonably can be inferred. *Murphy* v. *Commissioner of Motor Vehicles*, supra, 254 Conn. 344. Put another way, our task is not to choose between two competing factual narratives but, rather, to determine whether there was sufficient evidence in the record to support the commissioner's narrative. Moreover, "there is no requirement

that the fact [in question] be established by direct evidence. On the contrary, our case law clearly establishes that sufficient evidence justifying the commissioner's determination of probable cause may be found where the totality of the circumstances existing at the time of the plaintiff's arrest support[s] [such a finding] . . . ." (Footnote omitted; internal quotation marks omitted.) Id., 345. Given that circumstantial evidence can be used to establish the temporal nexus between operation and consumption of alcohol, it can also be used to establish the temporal nexus between operation and intoxication. See id., 347. In fact, "[i]t is *incumbent* upon [appellate courts] to rely on the circumstantial evidence obtained by the police to determine that there was sufficient evidence in the record to support a finding of probable cause." (Emphasis added.) Id.

A series of inferences underlie the commissioner's ultimate conclusion that the plaintiff was driving sometime after 9:05 p.m., all of which are supported by compelling circumstantial evidence. First, the evidence was sufficient to suggest that the plaintiff did not wait in his car long after the accident, which is significant because the plaintiff essentially claims that he crashed before 9:05 p.m. and sat in his car for a while until the fire chief appeared. The record reflects that the intersection at which the plaintiff lost control of his car is a well marked, four-way intersection of major roadways, and being, as Kowalsky testified, "one of the main thoroughfares coming into town," it is "a very heavily traveled very popular area." Additionally, the location is very close to Toyo. Accordingly, it was reasonable for the commissioner to infer that the fire chief reported the accident shortly after it occurred; the longer the car sat off the road, the less likely it would be for it to go unnoticed and unreported.

The plaintiff contends that this inference is not supported by the record. Specifically, he argues that his car came to rest far beyond the view of ordinary drivers on the road, having "crashed through the snowbank and drifted approximately 65.2 feet to final rest." He also argues that the fire chief was more perceptive than the average driver, and, thus, it is unreasonable to assume that anyone else would have discovered the accident. We are not persuaded. First, the police crash report clearly indicates that the measurement upon which the plaintiff relies reflected how far the car drifted past the intersection *parallel* to Route 85, not perpendicularly into the field. Even if a car were traveling on the other road in the intersection, the four-way stop would demand at least a cursory glance down both directions of Route 85. Moreover, the car came to rest between the roadway and a telephone pole, knocking over a sign for a local establishment somewhere along the way. Additionally, although it may very well be true that the fire chief would be more vigilant than an average passerby, there is nothing in the record to

suggest that his special training and experience led to his discovery of the plaintiff's car or that he had especially keen eyesight. Accordingly, we think it entirely reasonable on this record to infer that the car was in a place where it would have been observable to passersby.

Second, the evidence was sufficient to suggest that the plaintiff was in a hurry. The commissioner, therefore, reasonably could have concluded that operation occurred closer to 9:38 p.m. than 9:05 p.m. The plaintiff stated that he was "on his way home when his wife called him and asked him to go pick up their daughter at dance class." The round trip to the dance studio from the plaintiff's house and back took approximately twenty to thirty minutes in total. Furthermore, the fact that the plaintiff apparently requested a ride to the dance studio from someone else and abandoned his vehicle "less than thirty seconds" down the road implies that he was hurrying to pick up his daughter. When Kowalsky eventually arrived at the plaintiff's residence and spoke with his wife, she was not concerned that he had not yet arrived, suggesting either that she had called the plaintiff recently or that the daughter's dance lesson had yet to end, or both.[7] As a result, it was reasonable to infer that the plaintiff left Toyo shortly before receiving his wife's call and spun off the road closer to 9:38 p.m. than 9:05 p.m.

The plaintiff disputes the reasonableness of these inferences. He contends that there was no evidence to support the notion that his daughter was ready to be picked up from the dance studio when his wife called, and, in the alternative, that even if he had been in a hurry to pick her up, there is no reason for him to have been in a hurry to bring her home. This, however, does not comport with the plaintiff's failure to remain in his vehicle after speaking to the fire chief or to return to the scene of the accident to wait for AAA after he had secured a ride for his daughter, even though they rode past it in the pickup truck on their way back to his home. The plaintiff also argues that it was erroneous to consider the time it takes to drive from his home to the dance studio and back, because he was not at home when he left to pick up his daughter. The plaintiff's later admission to Kowalsky that he had to turn the car around after his wife called, however, indicates that he was already somewhere between his home and the dance studio.[8] This suggests an even shorter trip, which, in turn, implies that he received the phone call later in time, i.e., closer to 9:38 p.m. than 9:05 p.m.

Cognizant that our standard of review requires us to confirm only that there is sufficient evidence in the record to support the commissioner's findings, we cannot say that the court improperly found that there was substantial evidence in the record to support a finding that there was probable cause to arrest the plaintiff for

operating a motor vehicle while under the influence of alcohol. Individually, each of the commissioner's inferences is clearly supported the record. Together, they buoy the commissioner's conclusion that the plaintiff was operating his motor vehicle while under the influence of alcohol within two hours of the commencement of his chemical alcohol tests.

## II

The plaintiff next claims that the Superior Court abused its discretion in denying his motion to reargue or for reconsideration. Specifically, the plaintiff contends that he received ineffective assistance at the administrative hearing from his counsel resulting in a failure to present additional relevant evidence, namely, two affidavits, attesting that he had not been the driver of the car. This claim is without merit.

In denying the plaintiff's motion to reargue or for reconsideration, the court stated: "[T]he information presented was known to the plaintiff at the time of the original administrative hearing. Although the plaintiff argues that his counsel failed to present this evidence at the administrative hearing because he was distracted by a serious family emergency, the plaintiff offers no explanation for the subsequent failure to mention this evidence in the motion for reconsideration filed after the [commissioner] issued his final decision. Even more significantly, the plaintiff does not offer any explanation for failing to raise this claim in a motion to remand the matter to the department to present additional evidence pursuant to . . . § 4-183 (h). Such a motion properly could have been made at any time prior to the hearing on the merits, which was held on September 20, 2016. Notably, the plaintiff's counsel obtained [one of the proffered affidavits] nearly five months before the court's hearing on the merits, yet he failed to move for a remand or to present the affidavit to the court prior to the hearing, as required by [the statute]. To the contrary, in the statement of facts in his brief on appeal, the plaintiff's counsel stated that '[t]he plaintiff . . . admitted that he had been driving the vehicle when it went off the road.' The plaintiff cannot try his case on one theory and then seek to reargue it on grounds never presented to the court in the first instance."

Section 4-183 (h) provides in relevant part: "If, before the date set for hearing on the merits of an appeal, application is made to the court for leave to present additional evidence, and it is shown to the satisfaction of the court that the additional evidence is material and that there were good reasons for failure to present it in the proceeding before the agency, the court may order that the additional evidence be taken before the agency upon conditions determined by the court. . . ." The language of this statute clearly indicates that the trial court has the discretion to order such a remand where "good reasons" exist for the failure to present

the proffered evidence. See *Salmon* v. *Dept. of Health & Addiction Services*, 259 Conn. 288, 315, 788 A.2d 1199 (2002). Furthermore, the ineffective assistance of counsel may, in certain circumstances, constitute a "good reason." Id., 324.

It is important to note, however, that "a court order granting such [an application] does not vitiate the department's original decision, but instead permits [it] to consider new evidence and to modify its decision as necessary. Thus, a remand under § 4-183 (h) does not offer the parties an opportunity to relitigate the case ab initio, but rather represents a continuation of the original agency proceeding." Id., 319. Accordingly, such an application is the appropriate recourse where, as here, a plaintiff seeks to introduce additional evidence. Because the plaintiff failed to make a timely application for remand to the department for the taking of additional evidence pursuant to § 4-183 (h), and because the absence of such evidence formed the basis for his motion to reargue or for reconsideration, the court did not abuse its discretion in denying that motion.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The administrative hearing was held before a hearing officer. Inasmuch as the hearing officer acts on behalf of the commissioner, we hereinafter substitute commissioner for hearing officer where the facts ordinarily would call for reference to the latter. See *Murphy* v. *Commissioner of Motor Vehicles*, 254 Conn. 333, 341 n.12, 757 A.2d 561 (2000).

[2] Kowalsky testified that "[f]rom the time that I knocked on the door when I very first arrived at the address to the time that the pickup truck pulled in, I would say it was maybe two minutes."

[3] Police use the A-44 form to report an arrest related to operation of a motor vehicle while under the influence of alcohol and the results of any sobriety tests administered or the refusal to consent to such tests.

[4] General Statutes § 14-227b (g) provides, in relevant part, that a hearing to suspend a person's license "shall be limited to a determination of the following issues: (1) Did the police officer have probable cause to arrest the person for operating a motor vehicle while under the influence of intoxicating liquor or any drug or both; (2) was such person placed under arrest; (3) did such person refuse to submit to such test or analysis or did such person submit to such test or analysis, commenced within two hours of the time of operation, and the results of such test or analysis indicated that such person had an elevated blood alcohol content; and (4) was such person operating the motor vehicle."

[5] General Statutes § 14-227a (b) provides in relevant part: "[E]vidence respecting the amount of alcohol or drug in the defendant's blood or urine at the time of the alleged offense, as shown by a chemical analysis of the defendant's breath, blood or urine shall be admissible and competent provided . . . (6) evidence is presented that the test was commenced within two hours of operation. . . ."

[6] On this record, the plaintiff does not dispute the commissioner's finding that he operated a motor vehicle while under the influence of alcohol, but does dispute that there was sufficient evidence to support a finding that he did so at or after 9:05 p.m. But see part II of this opinion.

[7] The court noted that the plaintiff's wife also stated, in response to Kowalsky's question as to who was last driving the Volkswagen, that the plaintiff "*is* driving [it]." (Emphasis in original.) The plaintiff contends that this statement is not probative of the time of his operation. We agree that, standing alone, this statement would not provide much insight into the moment of operation. Nevertheless, Kowalsky's testimony and other evidence support the commissioner's findings as to the wife's manner and expectations regarding the plaintiff's arrival.

The plaintiff, however, also contends that his wife's statements constitute

hearsay evidence. The plaintiff acknowledges that such evidence is sometimes admissible in administrative proceedings but argues that "[a]lthough the admission of this evidence is not itself grounds for reversal, the trial court's conclusion may be questioned based on specific reliance on inconsistent hearsay as 'reliable, probative and substantial evidence.' " See *Gonzalez* v. *State Elections Enforcement Commission*, 145 Conn. App. 458, 483, 77 A.3d 790 ("[a]dministrative tribunals are not strictly bound by the rules of evidence and . . . they may consider evidence which would normally be incompetent in a judicial proceeding, as long as the evidence is reliable and probative" [internal quotation marks omitted]), cert. denied, 310 Conn. 954, 81 A.3d 1181 (2013). This claim was not argued before the commissioner or in the Superior Court, and, since there is no claim for extraordinary review, we decline to address it now. "[A] party cannot present a case to the trial court on one theory and then seek appellate relief on a different one. . . . For this court to . . . consider [a] claim on the basis of a specific legal ground not raised during trial would amount to trial by ambuscade, unfair to both the [court] and to the opposing party." (Citation omitted; internal quotation marks omitted.) *Dickman* v. *Office of State Ethics, Citizen's Ethics Advisory Board*, 140 Conn. App. 754, 764, 60 A.3d 297, cert. denied, 308 Conn. 934, 66 A.3d 497 (2013).

[8] Kowalsky testified that the studio was in the Westchester portion of Colchester.